# EXHIBIT C

**AMERICAN ARBITRATION ASSOCIATION®** | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

---

**Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box ☐. There is no additional administrative fee for this service.

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity to file an answering statement.

Name of Respondent:  Ashley Smith

Address:  304 Sandra Lane

| City:  Syracuse | State:  New York | Zip Code:  13212 |
|---|---|---|
| Phone No.: | Fax No.: | |

Email Address:  officerashleysmith@yahoo.com

Name of Representative (if known):

Name of Firm (if applicable):

Representative's Address:

| City: | State:  Select... | Zip Code: |
|---|---|---|
| Phone No.: | Fax No.: | |

Email Address:

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

Respondent breached her independent contractor agreements with Staccato 2011, LLC and Staccato Texas Ranch, LLC by failing to perform and knowingly assisted in a breach of another's breach of fiduciary duty. See Statements of Claims, attached.

Dollar Amount of Claim: $ 250,000

Other Relief Sought: ☑ Attorneys Fees  ☑ Interest  ☑ Arbitration Costs  ☑ Punitive/Exemplary
☐ Other:

Amount enclosed: $

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

Hearing locale:  Williamson County

*(check one)* ☐ Requested by Claimant  ☑ Locale provision included in the contract

---

AMERICAN
ARBITRATION
ASSOCIATION®    INTERNATIONAL CENTRE
FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

| | |
|---|---|
| Estimated time needed for hearings overall: | hours  or  **3**                        days |

Type of Business:

Claimant:  **Limited liability companies**                    Respondent:  **Individual**

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each other?

**No**

| Signature (may be signed by a representative): | Date: **9/10/2025** |
|---|---|

Name of Claimant:  **Staccato 2011, LLC,  Staccato Ranch Texas, LLC, and Nevada PF, LLC**

Address (to be used in connection with this case):  **1223 County Road 233**

| City:  **Florence** | State:  **Texas** | Zip Code:  **76527** |
|---|---|---|

| Phone No.: | Fax No.: |
|---|---|

Email Address:

Name of Representative:  **Eric Nichols**

Name of Firm (if applicable):  **Butler Snow LLP**

Representative's Address:  **1400 Lavaca Street, Suite 1000**

| City:  **Austin** | State:  **Texas** | Zip Code:  **78701** |
|---|---|---|

| Phone No.:  **(737) 802-1800** | Fax No.:  **(737) 802-1801** |
|---|---|

Email Address:  **Eric.Nichols@butlersnow.com**

To begin proceedings, **please file online at www.adr.org/fileonline**. You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| STACCATO 2011, LLC, STACCATO RANCH TEXAS, LLC, AND NEVADA PF, LLC, | ) ) ) ) | |
| *Claimants*, | ) ) | Case No. |
| v. | ) ) | |
| ASHLEY SMITH, | ) ) | |
| *Respondent*. | ) ) | |

## CLAIMANTS' STATEMENT OF CLAIMS

Claimants Staccato 2011, LLC ("Staccato 2011"), Staccato Ranch Texas, LLC ("Staccato Ranch"), and Nevada PF, LLC ("Staccato Vegas") (collectively, "Claimants" or "Staccato"), hereby file this Statement of Claims, and in support thereof state as follows

### PARTIES

1.    Claimant Staccato 2011, LLC is a limited liability company organized under the laws of the State of Delaware and is registered to do business in Texas with its principal place of business at 1223 County Road 233, Florence, Texas.

2.    Claimant Staccato Ranch Texas, LLC is a limited liability company organized under the laws of the State of Texas with its principal place of business at 1275 County Road 233, Florence, Texas 76527.

3.    Claimant Nevada PF, LLC is a limited liability company organized under the laws of the State of Nevada with its principal place of business at 1 Prairie Fire Road, Pahrump, Nevada 89061.

4.      Ashley Smith is an individual who resides in New York, and she may be served with process at her home address, 304 Sandra Lane, Syracuse, New York 13212, or wherever she may be found.

**AAA'S JURISDICTION**

5.      On June 6, 2024, Ashley Smith ("Smith" or "Respondent") signed two separate agreements to be an independent contractor (collectively, the "Independent Contractor Agreements") for Claimants.  Smith signed one agreement to be an to be an "Instagram Specialist" with Staccato Ranch, **Exhibit A**, and signed another agreement to be a "Pistol Instructor" with Staccato 2011, **Exhibit B**.

6.      The American Arbitration Association has jurisdiction over Smith pursuant to Sections 9 in the Independent Contractor Agreements, each of which provide that:

> Any controversy or claim (except those regarding Inventions, Work Product, Confidential Information or intellectual property) arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof, provided however, that each party will have a right to seek injunctive or other equitable relief in a court of law. The prevailing party will be entitled to receive from the non-prevailing party all costs, damages and expenses, including reasonable attorneys' fees, incurred by the prevailing party in connection with that action or proceeding, whether or not the controversy is reduced to judgment or award. The prevailing party will be that party who may be fairly said by the arbitrator(s) to have prevailed on the major disputed issues. Consultant hereby consents to the arbitration in the State of Texas in the County of Williamson.

*See* Ex. A and Ex. B.

**FACTS ALLEGATIONS**

A.      **Staccato's Business.**

7.      Staccato 2011 is a Texas-based firearms manufacturer renowned for its high-performance 2011® pistols.  Originally founded as STI International, the company rebranded to

Staccato 2011 in 2020 to reflect its expansion from a niche competition-gun maker into a premier supplier of duty-ready sidearms for law-enforcement officers, military professionals, and responsible citizens.  More than 1,800 agencies nationwide now rely on Staccato pistols, a testament to the company's engineering standards and its commitment to American craftsmanship: every pistol is machined from certified American billet steel by a veteran-led workforce, more than a quarter of whom have worn the nation's uniform.

8.      In conjunction with its manufacturing operations, Staccato 2011 operates two destination shooting facilities.  Staccato Ranch—located in Florence, Texas—serves as the original proving ground for new products and hosts a full slate of courses, matches, and member events. Staccato Vegas extends that experience to the Las Vegas market, offering more than fifty ranges, SWAT-style competition venues, and large-scale national events.

9.      Together, Staccato 2011, Staccato Ranch, and Staccato Vegas promote a unified "Staccato lifestyle" built on world-class firearms, elite training, and a tight-knit community.

**B.      Nathan Horvath's Employment with Staccato.**

10.      Nathan Horvath ("Horvath") spent nearly a decade in senior leadership at the Staccato entities, from November 15, 2018 until his separation from a Staccato entity on March 10, 2025.  Claimants came to understand that he had accepted an executive position with another firearms manufacturer.

11.      As CEO of Staccato 2011, Co-Chairman of the Staccato Board of Managers, and interim CEO of Staccato Vegas, Horvath owed Claimants unambiguous fiduciary duties to act loyally, avoid self-dealing, safeguard corporate assets, and comply with Board-approved controls.

**C.    Smith's Involvement With Staccato Entities.**

12.    At all times relevant to these claims, Smith was a licensed peace officer with full-time employment at a police department in New York State.

13.    Beginning in mid-2024 Horvath used his authority to install Smith as an independent contractor to Staccato Ranch and Staccato 2011.

14.    Multiple Staccato senior executives objected to Smith's hiring, but Horvath insisted and engaged Smith over their objections.

15.    During her tenure with Staccato 2011 and Staccato Ranch, Smith provided little to no discernible deliverables and failed to convert guests into members.  In fact, the lack of performance under the Independent Contractor Agreements and factual investigation has revealed that Smith never had any intent to perform under those agreements, and fraudulently represented that she would add value and promote Staccato's brand.

16.    When Staccato executives raised the lack of contribution and value to the Staccato entities for which Horvath hired Smith to be an independent contractor, Horvath terminated the two Staccato executives who had recommended terminating her Independent Contractor Agreements.  Staccato executives also raised concerns about the negative impact on the Staccato brand caused by Smith's Instagram  and online presence.

17.    Additionally, other Staccato executives lodged internal complaints regarding Smith and that Horvath's relationship with her appeared personal, not professional.  In fact, Horvath refused to investigate a detailed complaint that Smith sexually harassed a Staccato 2011 employee.

18.    Upon assuming the interim CEO role at Staccato Vegas, Horvath sought Staccato Board approval to hire Smith at the full-time-equivalent rate of $720,000 per year.  This was a rate

4

of pay that was multiple times higher than that paid to other Staccato employees in comparable positions.  The Staccato Board rejected the proposal.

19.    Undeterred, on or around July 16, 2024, Horvath unilaterally hired Smith at $110,000 per year, which is the full-time-equivalent rate of $572,000, with employee benefits. Smith's Employment Agreement, **Exhibit C**.  Notably, Horvath added five Staccato pistols to her "on-boarding package."  This was another benefit not provided in the normal course of business to similarly situated Staccato employees.   Providing firearms to employees as part of their compensation is not Staccato company policy.

20.    Horvath required Smith to be on site at Staccato Vegas only four days per month, apparently considering her full-time work with the New York State law enforcement agency.

**D.    Acts of Self-Dealing and Misappropriation Involving Smith.**

21.    Following Horvath's separation from the Staccato entities in March 2025, Claimants have uncovered an egregious pattern of self-dealing and concealment by Horvath and Smith that benefitted them both.  With Smith's complicity, Horvath abused his executive authority to disregard internal controls and divert company assets for his and Smith's personal gain, in violation of Horvath's fiduciary duties.

22.    The benefits accorded to Smith through Horvath's self-dealing and breaches of fiduciary duty included those set out above and more.  Smith was purportedly responsible for growing Staccato Vegas' membership numbers and attendance at Staccato Vegas events to fuel revenue.  Smith, however, did little to nothing tangible for the company.  Staccato did not grow membership or revenue in a manner attributable to any efforts by Smith.  The conclusion from internal investigation was clear:  the salary that Horvath directed to Smith was for a purpose other than the work, if any, that Smith performed for Staccato.

23.     In another instance of foregoing his fiduciary duties, as CEO, Horvath halted Staccato 2011's ordinary production so the factory could build two custom competition pistols—one for himself and one for Smith.  Only after his conduct was questioned did Horvath tender a personal check for $13,000 in a belated effort to absolve his unauthorized conduct for his own gain and that of Smith.

24.     Horvath also personally approved the transfer of two Staccato pistols to Smith when she was an independent contractor, in violation of Staccato 2011's no-transfer policy.  The terms of Smith's Independent Contractor Agreements did not have a requirement for firearms to be transferred in exchange for services.  Therefore, as it was not a contractual obligation, it appears Horvath "gifted" company assets.  To date, these two firearms have not been returned to the company and remain in Smith's control.

25.     Throughout his tenure, Horvath avoided Staccato's internal controls designed to detect financial abuse. Although company policy requires itemized receipts for every expense, Horvath routinely submitted only monthly credit-card statements.

26.     Horvath directed accounting personnel to grant the same improper exception to Smith—to process her invoices without supporting documentation.  Smith was the only independent contractor and subsequently employee (besides Horvath) relieved of the company's expense documentation obligations.

27.     By depriving the company of detailed documentation, Smith and Horvath insulated their expenditures from scrutiny and materially impaired Staccato's ability to further discover and prevent additional misuse of funds.  The obvious purpose in doing so was to obscure purchases and expenditures made by Horvath and Smith.

28.     Further, upon her departure from Staccato, Smith retained a MacBook laptop provided by Staccato.  Smith has not returned the Staccato company property and alleged that she was owed the laptop as part of her employment.  This is not the case, and the Independent Contractor Agreements and Smith's Employment Agreement do not contain any language allowing Smith to be gifted or to retain Staccato company property.

**E.  Case and Controversy Over the Nature of Smith's Relationship With Staccato Entities.**

29.     Following the departures of Smith and Horvath, Claimants received a demand letter from Smith's counsel accusing Staccato of employment-based claims including wrongful termination.  These claims raise a case and controversy over the nature of Smith's relationship with the Staccato entities.  For events that occurred prior to June 2024, Smith was neither an independent contractor nor employee of any Staccato entity.  During the time period of June 2024 through July 2024, Smith was not an employee of any Staccato entity, but was instead an independent contractor under contract with two Staccato entities.  An employment relationship with Staccato Vegas was sanctioned unilaterally by Horvath in July 2024, and any such relationship ended with Smith's separation from Staccato in early 2025.  Yet, Smith is apparently alleging employment-based claims over events that occurred long before any such employment relationship existed.

30.     The fact of the matter is that neither the independent contractor arrangements nor any employment relationship with Smith should have ever existed.  But for Smith's misrepresentations that she would add value to the Staccato entities—while maintaining full-time employment with a New York State law enforcement agency—and Horvath's breach of his duties to the Staccato entities, those relationships never would have existed.

31.     Together, these facts demonstrate a blatant and sustained course of fiduciary breaches, conversion of corporate assets, knowing violations of Staccato's internal policies, and acts of fraudulent inducement by Smith and breaches of her contractual duties under the Independent Contractor Agreements and her Employment Agreement.

## CAUSES OF ACTION

### COUNT 1 – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

32.     Claimants incorporate the foregoing paragraphs by reference.

33.     Smith had knowledge of Horvath's fiduciary duties to Claimants through his officer and director status.

34.     Smith knowingly rendered substantial assistance or encouragement to induce Horvath to breach his fiduciary duties to certain Claimants by, including but not limited to, misappropriating corporate assets, engaging in self-dealing, and elevating the interests of Horvath and Smith herself above those of Claimants.

35.     Claimants seek actual damages as a result of Smith's knowing participation in Horvath's breaches of fiduciary duty, in an amount to be determined at arbitration.

36.     Claimants further request equitable relief to prevent Smith from unfairly profiting from any ill-gotten gains resulting from her participation in Horvath's breaches of his fiduciary duties, including disgorgement, salary forfeiture, return of improper business expenses incurred by Smith, and attorneys' fees.

### COUNT 2 – FRAUDULENT INDUCEMENT INTO CONTRACT— INDEPENDENT CONTRACTOR AGREEMENTS

37.     Claimants incorporate the foregoing paragraphs by reference.

38.    Upon information and belief, on or about June 6, 2024, Smith made false and material representations that she would perform services for Claimants and add value to the company while Smith retained her full-time employment as an officer in another state.

39.    Smith made those misrepresentations knowing they were false, or made them recklessly without knowledge of their truth, intending for Claimants to act upon them.

40.    In fact, Claimants relied on these misrepresentations and compensated Smith per the Independent Contractor Agreements.

41.    As a result of Smith's fraud, Claimants suffered injuries for which they seek to recover.

42.    Claimants request rescission of the Independent Contractor Agreements and disgorgement by Smith of amounts paid under same.

### COUNT 3 – FRAUDULENT INDUCEMENT INTO CONTRACT— EMPLOYMENT AGREEMENT

43.    Claimants incorporate the foregoing paragraphs by reference.

44.    Upon information and belief, on or about July 16, 2024, Smith made false and material representations that she would perform services for Claimants and add value to the company while Smith retained her full-time employment as an officer in another state.

45.    Smith made those misrepresentations knowing they were false, or made them recklessly without knowledge of their truth, intending for Claimants to act upon them.

46.    In fact, Claimants relied on these misrepresentations and compensated Smith per the Employment Agreement.

47.    As a result of Smith's fraud, Claimants suffered injuries for which they seek to recover.

48.     Claimants request rescission of the Employment Agreement and disgorgement by Smith of amounts paid under same.

### COUNT 4 – BREACH OF CONTRACT

49.     Claimants incorporate the foregoing paragraphs by reference.

50.     Smith's Independent Contractor Agreements and Employment Agreement are valid, enforceable contracts.

51.     Claimants performed under the Independent Contractor Agreements and her Employment Agreement by providing payment to Smith.

52.     Under the agreements, Smith was to, among other responsibilities, build Staccato's brand, deliver its narrative, and grow audience size and engagement.  Additionally, Smith was to expand, deliver training videos, and provide firearms training.

53.     Yet, Smith provided little to no discernable deliverables while at Staccato.  Simply put, Smith failed to perform under her agreements.  As a result of Smith's actions, or rather lack thereof, Claimants have been injured.

54.     Claimants seek damages in the amount of funds paid under the agreements.

### COUNT 5 – UNJUST ENRICHMENT

55.     Claimants incorporate the foregoing paragraphs by reference.

56.     Smith has been unjustly enriched by the funds that she received, directly or indirectly, based on principles of justice, equity, and good conscience.  It would be fundamentally unfair to allow Smith to retain the amounts wrongfully obtained.  Claimants are entitled to damages so that Smith will not be unjustly enriched due to her conduct.

57.     Claimants therefore seek full and complete restitution and disgorgement of all losses, damages, or other benefits deriving, directly or indirectly, from Smith's unjust enrichments.

## COUNT 6 – MONEY HAD AND RECEIVED

58.     Claimants incorporate the foregoing paragraphs by reference.

59.     Smith holds money that in equity and good conscience belongs to Claimants in an amount to be proven at trial.  Smith is liable for actual damages, exemplary damages, pre-judgment and post-judgment interest, and costs of court.

## COUNT 7 – REQUEST FOR DECLARATORY RELIEF

60.     Claimants incorporate the foregoing paragraphs by reference.

61.     There is a justiciable controversy among the parties regarding Smith's status as an independent contractor.  It is Claimants' position that: (a) prior to June 6, 2024, Smith had no connection to Claimants, (b) Smith became an independent contractor on June 6, 2024; (c) Smith became an employee of Staccato Vegas on July 16, 2024.  Based on information and belief, it is Smith's position that she held an employee status at dates earlier than June 6, 2024 and July 16, 2024.

62.     Pursuant to Texas Civil Practice and Remedies Code § 37.001 *et seq.*, Claimants request, following application of the facts to applicable law, that the Court make the following declarations:

> a.  That, under the terms of the Agreements, Smith became an independent contractor beginning on June 6, 2024 and at no point prior to this date was Smith an independent contractor or employee for any of Claimants.

> b.  That, under the terms of Smith's Employment Agreement, Smith became an employee on July 16, 2024 and at no point prior to this date was Smith an employee of Staccato Vegas.

## COUNT 8 – REQUEST FOR INJUNCTIVE RELIEF

63.    Claimants incorporate the foregoing paragraphs by reference.

64.    Claimants seek and require injunctive relief to remedy Smith's deliberate violation of company policy and failure to return Staccato 2011 property.  Smith is currently exercising control over a Staccato-owned MacBook laptop (the "Company Property") provided to Smith. Claimants have previously requested that Smith return the Company Property, but Smith has failed to do so.   Smith has no right to the Company Property the return of same is necessary to ensure that the safeguarding of Staccato company property.

65.    Accordingly, Claimants seek interim relief under AAA Commercial Arbitration Rule R-38 for an order requiring Smith to preserve and return the Company Property to Claimants.

66.    Claimants are the lawful owner of the Company Property.

67.    Smith is unlawfully exercising control over the Company Property.

68.    Smith has failed to return the Company Property.

69.    Claimants request for injunctive relief is authorized by Texas Civil Practice and Remedies Code Section 65.011 and AAA Commercial Arbitration Rule R-38.

70.    Claimants have no adequate remedy at law.

## **CONDITIONS PRECEDENT**

71.    For each cause of action alleged in this Petition, all conditions precedent have been satisfied or excused.

## **PRAYER FOR RELIEF**

WHEREFORE, Claimants demand a judgment in its favor and against Respondent in each Cause of Action, and respectfully requests the following relief:

a.   Damages in an amount within the jurisdiction limits of this Court;

b.  Disgorgement and/or restitution of all benefits Respondent has wrongfully obtained or retained;

c.  Rescission of Smith's Independent Contractor Agreements and Employment Agreement;

d.  Declaratory relief as requested in this petition;

e.  Temporary and permanent injunctive relief as requested by Claimants;

f.  Reasonable and necessary attorneys' fees and costs;

g.  Pre-judgment and post-judgment interest at the highest rates permitted by law;

h.  Recoverable costs of court; and

i.  Such other and further relief, both at law and in equity, to which the Claimants may show themselves to be justly entitled.

Dated: September 12, 2025

Respectfully submitted,

**BUTLER SNOW LLP**

By: */s/ Eric J.R. Nichols*
Eric J.R. Nichols
State Bar No. 14994900
Eric.Nichols@butlersnow.com
J.R. Johnson
State Bar No. 24070000
JR.Johnson@butlersnow.com
Roshni Mahendru
State Bar No. 24138224
Roshni.Mahendru@butlersnow.com
1400 Lavaca Street, Suite 1000
Austin, TX 78701
Tel: (737) 802-1800
Fax: (737) 802-1801

**JACKSON WALKER L.L.P.**
David Schlottman
State Bar No. 24083807

dschlottman@jw.com
Lauren Vogel
Texas State Bar No. 24114574
lvogel@jw.com
2323 Ross Ave., Suite 600
Dallas, Texas 75201
(214) 953-6000
(214) 953-5822 – Fax

**ATTORNEYS FOR CLAIMANTS,
STACCATO 2011, LLC,
STACCATO RANCH TEXAS, LLC, AND
NEVADA PF, LLC**

# EXHIBIT A

**Staccato 2011, LLC & Staccato Ranch Texas, LLC**

**Contractor Offer Letter Agreement**

**Date:** 6/6/2024
**Contractor Name:** Ashley Smith
**Contractor Address:** 304 Sandra Lane North Syr

**Company Name:** Staccato 2011, LLC
**Company Address:** 1223 CR 233 Florence, Texas 76527

**Company Name:** Staccato Ranch Texas, LLC
**Company Address:** 1223 CR 233 Florence, Texas 76527

This Consulting Agreement, dated as of June 6, 2024 (the "Effective Date"), is by and between Ashley Smith, a resident of the State of New York ("Consultant"), Staccato 2011 LLC and Staccato Ranch Texas, LLC, a Texas Limited Liability Company ("Company").

**Consultant and Company agree as follows:**

1. **Services; Payment; No Violation of Rights or Obligations.**
Consultant agrees to undertake and complete the Services described on **Exhibit A** (the "Services") in accordance with and on the schedule specified in **Exhibit A** (the "Term"). As the only consideration due Consultant regarding the subject matter of this Agreement, including but not limited to, the provision of the Services described herein and the covenants contained in Paragraph 2(d) herein, Company will pay Consultant the consulting fees described on Exhibit A (the "Fees"). Consultant agrees that it will not, and will not permit others to, violate any agreement with or rights of any third party or, except as expressly authorized by Company in writing, use or disclose at any time Consultant's own or any third party's confidential information or intellectual to or for the benefit of Company.

2. **Ownership; Rights; Proprietary Information; Publicity.**
   a. Company shall own all right, title, and interest, including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, *sui generis* database rights and all other intellectual property rights of any sort throughout the world, in and to any and all inventions (whether or not patentable), works of authorship, mask works, designations, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by or for or on behalf of Consultant during the Term that relate to the subject matter of, or arise out of or in connection with, the Services or any Confidential Information (as defined below) (collectively, "Inventions"). Consultant will promptly disclose and provide all Inventions to Company.

   b. Consultant acknowledges and agrees that all right, title and interest in any "work", as that term is defined in 17 U.S.C. Section 101 et. Seq., that Consultant produces during the performance of the Services pursuant to this Agreement, including written information in the form of memoranda, reports, studies, plans and analyses and falling within the meaning of 17 U.S.C. Section 101 et. Seq., whether preliminary or final, and all copies in which such work is embodied ("Work Product") shall be owned by Company and considered "Work Made for Hire" within the meaning of 17 U.S.C. Section 101 et. seq. To the extent any portion of the Work Product does not constitute a "Work Made for Hire" within the meaning of 17 U.S.C. Section

1

101 et. seq., Consultant hereby transfers and assigns to Company, its successors and assigns, for good and valuable consideration the receipt of which Consultant acknowledges, all worldwide rights, title, and interest in such portions of the Work Product. Further, Consultant agrees, either during the Term or thereafter, to execute and deliver, from time to time, such documents as may be necessary or convenient to effectuate the assignment and transfer of any Work Product and shall cooperate with and assist Company in every proper way (at the expense of Company) in obtaining and from time to time enforcing Company's rights in the Work Product. Consultant hereby irrevocably designates and appoints Company as its agent and attorney-in-fact, coupled with an interest, to act for and on Consultant's behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by Consultant.

c.  Consultant agrees that all Inventions and all other business, technical and financial information, including the identity of, and information relating to, customers or employees, developed, learned or obtained by or for or on behalf of Consultant during the Term that relate to Company or the business or demonstrably anticipated business of Company or its affiliates or in connection with the Services, or that are received by or for Company in confidence, constitute "Confidential Information". Consultant shall hold in confidence and not disclose or, except in performing the Services, use any Confidential Information. Confidential Information shall not include information that Consultant can document is publicly available without restriction through no fault of Consultant. Upon termination or as otherwise requested by Company, Consultant will promptly provide to Company all items and copies containing or embodying Confidential Information, except that Consultant may keep personal copies of payment and billing records and this Agreement. Consultant also recognizes and agrees that Consultant has no expectation of privacy with respect to Company's telecommunications, networking or information processing systems, including stored computer files, email and voice messages, and that Consultant's activity, and any files or messages, on or using any of those systems may be monitored at any time without notice.

d.  Consultant agrees that during the Term and for twelve months thereafter (i) Consultant will not directly or indirectly encourage or solicit any employee or consultant of Company to leave Company for any reason and (ii) Consultant will not engage in any activity with a business located in Central Texas that is in any way competitive with the business or demonstrably anticipated business of Company, and (iii) Consultant will not assist any other person or organization located in Central Texas in competing or in preparing to compete with any business or demonstrably anticipated business of Company. Without limiting the foregoing, Consultant may perform services for other persons during and after the Term of this Agreement, provided that such services do not represent a conflict of interest or a breach of Consultant's obligation under this Agreement.

e.  To the extent allowed by law, any right, title or license granted Company hereunder includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like. Furthermore, Consultant agrees that notwithstanding any rights of publicity, privacy or otherwise, whether or not statutory, anywhere in the world, and without any further compensation, Company may and is hereby authorized to, and to allow others to, use Consultant's name in connection with promotion of its business, products or services. To the extent any of the foregoing is ineffective under applicable law, Consultant hereby provides any and all ratifications and consents

necessary to accomplish the purposes of the foregoing to the extent possible. Consultant will confirm any such ratifications and consents from time to time as requested by Company. If any other person is in any way involved in any Services, Consultant will obtain the foregoing ratifications, consents and authorizations from such person for Company's exclusive benefit.

f.   If any part of the Services or Inventions or information provided hereunder is based on, incorporates, or is an improvement or derivative of, or cannot be reasonably and fully made, used, reproduced, distributed and otherwise exploited without using or violating technology or intellectual property rights owned by or licensed to Consultant or any person involved in the Services and not assigned hereunder, Consultant hereby grants Company and its successors a perpetual, irrevocable, worldwide royalty-free, non-exclusive, transferable, sublicensable right and license to exploit and exercise all such technology and intellectual property rights in support of Company's exercise or exploitation of the Services, Inventions, Work Product, other work or information performed or provided hereunder, or any assigned rights, including any modifications, improvements and derivatives of any of them.

**3.   Warranties and Other Obligations.**
Consultant represents, warrants and covenants that: (a) the Services will be performed in a professional and workmanlike manner and that none of such Services nor any part of this Agreement is or will be inconsistent with any obligation Consultant may have to others; (b) all work under this Agreement shall be Consultant's original work and none of the Services, Work Product or Inventions nor any development, use, production, distribution or exploitation thereof will infringe, misappropriate or violate any intellectual property or other right of any person or entity; (c) Consultant has the full right to provide Company with the assignments and rights provided for herein and has written enforceable agreements with all persons necessary to give the rights to do the foregoing and otherwise fully perform this Agreement; (d) Consultant shall comply with all applicable laws and Company safety rules in the course of performing the Services; and (e) if Consultant's work requires a license, Consultant has obtained that license and the license is in full force and effect.

**4.   Termination.**
Both Company and Consultant may terminate the Agreement early as desired, upon providing 2 weeks advance written notice to the other party.  Such termination shall be effective after 2 weeks of notice of early termination. Upon an early termination, Consultant shall receive a pro-rated payment for services actually rendered, to the Company's reasonable satisfaction, up to the termination date. Sections 2 through 10 of this Agreement and any remedies for breach of this Agreement shall survive any termination or expiration. Company may communicate the surviving obligations contained in this Agreement to any other or potential client or employer of Consultant.

**5.   Relationship of the Parties; Independent Contractor; No Employee Benefits.**
Notwithstanding any provision hereof, Consultant is an independent contractor and is not an employee, agent, partner or joint venturer of Company and shall not bind nor attempt to bind Company to any obligation. Consultant shall accept any directions issued by Company pertaining to the goals to be attained and the results to be achieved by Consultant, but Consultant shall be solely responsible for the manner and hours in which the Services are performed under this Agreement. Consultant shall not be eligible to participate in any of Company's employee benefit plans, fringe benefit programs, group insurance arrangements or similar programs. Company shall not provide workers' compensation, disability insurance, Social Security or unemployment compensation coverage or any other statutory benefit to Consultant. Consultant shall comply at Consultant's

expense with all applicable provisions of workers' compensation laws, unemployment compensation laws, federal Social Security law, the Fair Labor Standards Act, federal, state and local income tax laws, and all other applicable federal, state and local laws, regulations and codes relating to terms and conditions of employment required to be fulfilled by employers or independent contractors. Consultant will ensure that its employees, contractors and others involved in the Services, if any, are bound in writing to the foregoing, and to all of Consultant's obligations under any provision of this Agreement, for Company's benefit and Consultant will be responsible for any noncompliance by them. Consultant agrees to indemnify Company from any and all claims, damages, liability, settlement, attorneys' fees and expenses, as incurred, on account of the foregoing or any breach of this Agreement or any other action or inaction by or for or on behalf of Consultant.

Consultant shall determine the manner, means and method of completing the Services (outlined in Exhibit A below), and Company reserves no control over the specific day-to-day Services rendered by Consultant. Consultant has the ability to set Consultant's own hours when Services will be performed. Further, Company enters into this Agreement with the expectation that Consultant has the requisite market understanding, training, and experience, and Company will not provide any education or training to Consultant on connection with the performance of Services.

**6. Assignment.**
This Agreement and the Services are personal to Consultant and Consultant shall have no right or ability to assign, transfer or subcontract any rights or obligations under this Agreement. Any attempt to do so shall be void. Company may freely assign and transfer this Agreement in whole or part.

**7. Notices.**
All notices under this Agreement shall be in writing and delivered in person, by overnight courier or confirmed email, in each case at the address set forth on the signature page or to such other address as such party last provided to the other by written notice. Notices will be deemed delivered upon receipt.

**8. Indemnification.**
Consultant agrees to indemnify and hold harmless Company and its affiliates, and their respective directors, officers and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (a) any negligent, reckless, intentionally wrongful, or otherwise unlawful act of Consultant or Consultant's subcontractors, assistants, employees or agents, (b) a determination by a court or agency that Consultant is not an independent contractor, but only if Consultant initiated or joined in support of such court or agency action (c) any breach by Consultant or Consultant's assistants, employees or agents of any of the covenants contained in this Agreement, (d) any failure of Consultant, or Consultant's subcontractors, assistants, employees or agents,  to perform the Services in accordance with all applicable laws, rules and regulations, or (e) any violation of a third party's rights resulting in whole or in part from Company's use of the work product of Consultant under this Agreement. Consultant also agrees to provide workers' compensation insurance for Consultant's employees and agents and agrees to defend, hold harmless and indemnify Company for any and all claims arising out of any injury, disability, or death of any of Consultant's employees or agents.

**9. Arbitration.**

Any controversy or claim (except those regarding Inventions, Work Product, Confidential Information or intellectual property) arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof, provided however, that each party will have a right to seek injunctive or other equitable relief in a court of law. The prevailing party will be entitled to receive from the non-prevailing party all costs, damages and expenses, including reasonable attorneys' fees, incurred by the prevailing party in connection with that action or proceeding, whether or not the controversy is reduced to judgment or award. The prevailing party will be that party who may be fairly said by the arbitrator(s) to have prevailed on the major disputed issues. Consultant hereby consents to the arbitration in the State of Texas in the County of Williamson.

NOTICE: This Agreement does not affect any immunity under 18 USC Sections 1833(b) (1) or (2), which read as follows (note that for purposes of this statute only, individuals performing work as contractors or consultants are considered to be employees):

(1) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

10. **Assignments; Use of Employees or Subcontractors**.
Consultant may not assign this Agreement or any duties or obligations under this Agreement without Company's express written consent. Any such assignment will be considered null and void. Company requires such consent to protect intellectual property rights and Client confidentialities. Consultant agrees to require any third-parties working on behalf of Consultant to sign intellectual property and confidentiality agreements prior to and as a condition of their employment or engagement. Company is authorized to assign any of its rights with or without the consent of Consultant.

11. **Miscellaneous.**
Any breach of Section 2 or 3 will cause irreparable harm to Company for which damages would not be an adequate remedy, and therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies. The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights. No changes, additions, modifications or waivers to this Agreement will be effective unless in writing and signed by both parties. In the event that any provision of this Agreement shall be determined to be illegal or unenforceable, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to the conflicts of laws provisions thereof. In any action or proceeding to enforce rights under this Agreement, the prevailing party will be entitled to recover costs and attorneys' fees. Headings herein are for convenience of reference only and shall in no way affect interpretation of the Agreement. This

5

Agreement and Exhibit A represent the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements between the parties with respect to the subject matter hereof.

Consultant is responsible for payment of Consultant's taxes and insurance. Consultant is responsible for hiring any subcontractors, assistants, agents, or employees to assist Consultant to provide the Services described herein. All such subcontractors, assistants, agents, and employees shall be hired or engaged at Consultant's expense and all labor performed by any such person(s) shall be under the sole direction and control of Consultant. Consultant will determine the method, details, and means of performing the Services. Consultant may perform the services under this Agreement at any suitable time and location as Consultant chooses. Consultant will use their own resources such as supplies, equipment, tools, and materials to complete the Services. Consultant shall devote such working time and attention to the performance of the services as required to satisfy all duties and responsibilities of Consultant in finishing the assignment.

Consultant shall perform their obligations hereunder in compliance with the terms of this Agreement and any and all applicable laws and regulations. If necessity requires Consultant to perform any services on Company's property or requires Consultant to interact with any of Client's employees, customers, vendors, affiliates or members of the general public, Consultant shall comply with all of Company's policies and regulations to the greatest extent permitted by Texas law governing independent contractor agreements.

12. **Consultant Representations.** Consultant warrants that Consultant is legally capable of entering this Agreement and that there are no other existing agreements or instruments that would impair Consultant's ability to perform the services described in this Agreement. Consultant also warrants that any statements about Consultant's abilities or qualifications to competently complete the described services are accurate and made in good faith. Consultant warrants that all work completed will be Consultant's original work and will not in any way legally infringe upon the rights of others.

13. **Return of Materials**. Upon expiration or termination of this Agreement, successful completion of the services to be provided under this Agreement, or as otherwise requested by Company, Consultant will deliver to Company any Company documents, items, and materials and will provide Company with a signed, written certification that all such documents, items, and materials in the possession of Consultant (and any of Consultant's employees, agents, assistants and/or subcontractors) have been returned.

14. **Expiration of Agreement.** Unless otherwise terminated as provided in this Agreement, this Agreement will continue in effect until the Services provided for in this Agreement have been fully and completely performed to the satisfaction of Company or until such time as Company provides notice of termination.

15. **Entire Agreement; Modifications.** This Agreement, together with any exhibits, schedules, or other documents referenced herein, supersedes any and all agreements, either oral or written, between the parties with respect to the rendering of services by Consultant for Company and contains all of the representations, warranties, covenants, and agreements between the parties with respect to the rendering of those services. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made

by any party, or anyone acting on behalf of any party, which are not contained in this Agreement, and that no other agreement, statement, or promise not contained in this Agreement will be valid or binding. Any modification of this Agreement will be effective only if it is in a writing signed by an authorized representative of the party to be charged.

16. **Partial Invalidity; Severability; Modification.** If any provision, term, covenant or obligation of this Agreement, or its application, is held invalid, unenforceable, or unlawful, such invalidity, unenforceability or unlawfulness, shall not affect the other provisions, terms, covenants or obligations of this Agreement, or their application, which all shall remain valid and enforceable in full force and effect to the extent permitted by law. Further, if a court or other adjudicative body finds any covenant of this Agreement to be unenforceable with respect to a jurisdiction, the parties agree that the court shall amend such obligations for the protection of Company's business to the minimum extent necessary to render the provision enforceable and that the Agreement shall be enforced within such jurisdiction as so amended.

17. **Attorney's Fees.** If either party incurs any legal fees associated with the enforcement of this Agreement or any rights under this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and any court, arbitration, mediation, or other litigation expenses from the other party.

**18. Good Faith and Fair Dealing.** This Agreement imposes a duty on Consultant to use Consultant's best and reasonable efforts to complete the Services described herein and to perform the duties, terms, and covenants of this Agreement.  Consultant specifically understands and agrees this Agreement imposes a duty of candor, loyalty, and good faith and fair dealing on Consultant.

**19. Waiver:** Rights Cumulative. No waiver of any term or right in this Agreement shall be effective unless in writing, signed by an authorized representative of the waiving party. The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or modification of such provision, or impairment of its right to enforce such provision or any other provision of this Agreement thereafter. The rights and remedies of the parties herein provided shall be cumulative and not exclusive of any rights or remedies provided by law or equity.

**20. Counterparts.** This Agreement may be executed by email and in one or more counterparts, each of which will be deemed to be an original, but all of which together will constitute one and the same instrument, without necessity of production of the others

## EXHIBIT A

This EXHIBIT A is attached to and incorporated into that certain Consulting Agreement, dated June 6, 2024, by and between Ashley Smith, Staccato 2011, LLC, and Staccato Ranch Texas, LLC, a Texas Limited Liability Company (the "Agreement"). Capitalized terms not otherwise defined shall have the meaning set forth in the Agreement. In the event of a conflict between the terms of this Exhibit and the Agreement, the terms of the Agreement will control.

## INSTAGRAM SPECIALIST

Dear Ashley,

We are pleased to offer you the a contract role as Instagram Specialist. In this position you will report to the VP Marketing. As an officer and a social media influencer, we believe you have strong alignment with our mission and values, and you have the experience to make an immediate impact for the Staccato brand and Staccato Ranch. While we have discussed the position, we have highlighted specifics related to our company and mission, as well as responsibilities and goals of your role.

### THE COMPANY

Built for Heroes and based in Florence, Texas, Staccato is on a mission to proudly serve those who protect and embody American freedoms. As the inventors of the 2011® platform—the World's Best Shooting Pistols—Staccato manufactures its handguns and ammunition in America at their headquarters in Florence, TX. The Staccato 2011 has been approved for on- or off-duty carry by over 1,600 U.S. law enforcement agencies in just five years, including elite teams such as U.S. Marshals Special Operations Group, the Texas Rangers and Miami Dade Special Response Team. With a spirit of American ingenuity and commitment to its family of owners, Staccato guarantees its guns for life, and guarantees supply of its 9mm ammunition to subscribers of its ammo service. Staccato Ranch serves as the place where Staccato unites its family of patriots to celebrate freedom and elevate heroes every day.

Staccato was ranked one of the Fastest Growing Private Companies in the Southwest by Inc. Over 25% of our team members are veterans and 100% are patriots. We strive relentlessly to achieve our best every day and are focused on continuous improvement and progress in everything we do.

### THE MISSION

We protect freedom. We proudly serve those who protect and embody American freedoms.

### RESPONSIBILITIES: INSTAGRAM SPECIALIST

You will serve as an Instagram Specialist. Building on the trust and credibility Staccato has earned with its growing and loyal customer base, you will manage Staccato's Instagram channels (@staccato2011 and @staccatoranch_tx) to build its brand, deliver the brand's narrative, and grow its audience size and engagement. As a Staccato team member, you will display entrepreneurialism and energy, reflect our core values, and share the shootability of our pistols, the insane accuracy of our ammunition, and the uniqueness of our Staccato Ranch experiences both through Staccato's Instagram channels and your personal social media channels.

**Key responsibilities include**:

1) **Insight-Driven Strategy:** Develop an Instagram strategy for both @staccato2011 and @staccatoranch_tx that is insight-driven, including analysis of cultural, community, media and market trends to inform what channels Staccato will play in and in how it will play in those channels

2) **Planning & Development:** Plan and develop Instagram campaigns and activations that integrate with and enhance Staccato's broader social media, brand, demand generation and GTM campaigns

3) **Editorial Calendar & Publishing:** Develop and manage our Instagram editorial calendar and publish content

4) **Content Strategy & Development:** Collaborate with other members of the Marketing team to ensure that Instagram is strategically driven and engaging and aligned with our broader social media and content plans

5) **Community Management:** Develop an Instagram community management plan and ensure that we are engaging with our community via comments and other relevant methods

6) **Measure & Report:** Monitor and analyze campaign performance, adjust strategies as needed and provide monthly reporting within 5 business days of month's end

7) **Promote Staccato via Personal Social:** Promote the Staccato brand, products and experiences via your personal social media account(s)

   a) **Exclusivity:** Exclusively represent Staccato where Staccato currently has offerings (i.e. handguns, 9mm ammunition and Staccato Ranch) and future offerings (e.g. apparel and other new product verticals)

   b) **Reporting:** Provide monthly reporting on Staccato-related posts on your personal social media

8) **2024 Goals:** Actively grow audience for both @staccato2011 and @staccatoranch_tx, and improve engagement rate


**COMPENSATION**

Your contract compensation will be $4,000 per month covering the responsibilities listed above.

**Signatures**
**Contractor:**

Signature:

Ashley Smith (Jun 6, 2024 09:26 EDT)

Name:    Ashley Smith

Date:    06/06/2024


**Company Representative:**

Signature:

David Fossas (Jun 6, 2024 08:33 CDT)

Name:    David Fossas

Date:    06/06/2024

# 20240606_Ashley Smith_Contract Offer_IG Specialist

Final Audit Report                                              2024-06-06

| | |
|---|---|
| Created: | 2024-06-06 |
| By: | David Fossas (david.fossas@staccato2011.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAnQUIAymn0GdTP33Q373zIS8xOgg2U7iE |

## "20240606_Ashley Smith_Contract Offer_IG Specialist" History

Document created by David Fossas (david.fossas@staccato2011.com)
2024-06-06 - 1:12:45 PM GMT

Document emailed to Ashley Smith (officerashleysmith@yahoo.com) for signature
2024-06-06 - 1:12:51 PM GMT

Document emailed to David Fossas (david.fossas@staccato2011.com) for signature
2024-06-06 - 1:12:52 PM GMT

Email viewed by Ashley Smith (officerashleysmith@yahoo.com)
2024-06-06 - 1:16:18 PM GMT

Document e-signed by Ashley Smith (officerashleysmith@yahoo.com)
Signature Date: 2024-06-06 - 1:26:15 PM GMT - Time Source: server

Email viewed by David Fossas (david.fossas@staccato2011.com)
2024-06-06 - 1:30:16 PM GMT

Document e-signed by David Fossas (david.fossas@staccato2011.com)
Signature Date: 2024-06-06 - 1:33:17 PM GMT - Time Source: server

Agreement completed.
2024-06-06 - 1:33:17 PM GMT

**Adobe Acrobat Sign**

# EXHIBIT B

**Staccato 2011, LLC & Staccato Ranch Texas, LLC**

**Contractor Offer Letter Agreement**

**Date:** 6/3/2024
**Contractor Name:** Ashley Smith
**Contractor Address:**

**Company Name:** Staccato 2011, LLC
**Company Address:** 1223 CR 233 Florence, Texas 76527

**Company Name:** Staccato Ranch Texas, LLC
**Company Address:** 1223 CR 233 Florence, Texas 76527

This Consulting Agreement, dated as of June 3, 2024 (the "Effective Date"), is by and between Ashley Smith, a resident of the State of New York ("Consultant"), Staccato 2011 LLC and Staccato Ranch Texas, LLC, a Texas Limited Liability Company ("Company").

**Consultant and Company agree as follows:**

1. **Services; Payment; No Violation of Rights or Obligations.**
Consultant agrees to undertake and complete the Services described on **Exhibit A** (the "Services") in accordance with and on the schedule specified in **Exhibit A** (the "Term"). As the only consideration due Consultant regarding the subject matter of this Agreement, including but not limited to, the provision of the Services described herein and the covenants contained in Paragraph 2(d) herein, Company will pay Consultant the consulting fees described on Exhibit A (the "Fees"). Consultant agrees that it will not, and will not permit others to, violate any agreement with or rights of any third party or, except as expressly authorized by Company in writing, use or disclose at any time Consultant's own or any third party's confidential information or intellectual to or for the benefit of Company.

2. **Ownership; Rights; Proprietary Information; Publicity.**
   a. Company shall own all right, title, and interest, including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, *sui generis* database rights and all other intellectual property rights of any sort throughout the world, in and to any and all inventions (whether or not patentable), works of authorship, mask works, designations, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by or for or on behalf of Consultant during the Term that relate to the subject matter of, or arise out of or in connection with, the Services or any Confidential Information (as defined below) (collectively, "Inventions"). Consultant will promptly disclose and provide all Inventions to Company.

   b. Consultant acknowledges and agrees that all right, title and interest in any "work", as that term is defined in 17 U.S.C. Section 101 et. Seq., that Consultant produces during the performance of the Services pursuant to this Agreement, including written information in the form of memoranda, reports, studies, plans and analyses and falling within the meaning of 17 U.S.C. Section 101 et. Seq., whether preliminary or final, and all copies in which such work is embodied ("Work Product") shall be owned by Company and considered "Work Made for Hire" within the meaning of 17 U.S.C. Section 101 et. seq. To the extent any portion of the Work Product does not constitute a "Work Made for Hire" within the meaning of 17 U.S.C. Section

1

101 et. seq., Consultant hereby transfers and assigns to Company, its successors and assigns, for good and valuable consideration the receipt of which Consultant acknowledges, all worldwide rights, title, and interest in such portions of the Work Product. Further, Consultant agrees, either during the Term or thereafter, to execute and deliver, from time to time, such documents as may be necessary or convenient to effectuate the assignment and transfer of any Work Product and shall cooperate with and assist Company in every proper way (at the expense of Company) in obtaining and from time to time enforcing Company's rights in the Work Product. Consultant hereby irrevocably designates and appoints Company as its agent and attorney-in-fact, coupled with an interest, to act for and on Consultant's behalf to execute and file any document and to do all other lawfully permitted acts to further the foregoing with the same legal force and effect as if executed by Consultant.

c.   Consultant agrees that all Inventions and all other business, technical and financial information, including the identity of, and information relating to, customers or employees, developed, learned or obtained by or for or on behalf of Consultant during the Term that relate to Company or the business or demonstrably anticipated business of Company or its affiliates or in connection with the Services, or that are received by or for Company in confidence, constitute "Confidential Information". Consultant shall hold in confidence and not disclose or, except in performing the Services, use any Confidential Information. Confidential Information shall not include information that Consultant can document is publicly available without restriction through no fault of Consultant. Upon termination or as otherwise requested by Company, Consultant will promptly provide to Company all items and copies containing or embodying Confidential Information, except that Consultant may keep personal copies of payment and billing records and this Agreement. Consultant also recognizes and agrees that Consultant has no expectation of privacy with respect to Company's telecommunications, networking or information processing systems, including stored computer files, email and voice messages, and that Consultant's activity, and any files or messages, on or using any of those systems may be monitored at any time without notice.

d.   Consultant agrees that during the Term and for twelve months thereafter (i) Consultant will not directly or indirectly encourage or solicit any employee or consultant of Company to leave Company for any reason and (ii) Consultant will not engage in any activity with a business located in Central Texas that is in any way competitive with the business or demonstrably anticipated business of Company, and (iii) Consultant will not assist any other person or organization located in Central Texas in competing or in preparing to compete with any business or demonstrably anticipated business of Company. Without limiting the foregoing, Consultant may perform services for other persons during and after the Term of this Agreement, provided that such services do not represent a conflict of interest or a breach of Consultant's obligation under this Agreement.

e.   To the extent allowed by law, any right, title or license granted Company hereunder includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like. Furthermore, Consultant agrees that notwithstanding any rights of publicity, privacy or otherwise, whether or not statutory, anywhere in the world, and without any further compensation, Company may and is hereby authorized to, and to allow others to, use Consultant's name in connection with promotion of its business, products or services. To the extent any of the foregoing is ineffective under applicable law, Consultant hereby provides any and all ratifications and consents

necessary to accomplish the purposes of the foregoing to the extent possible. Consultant will confirm any such ratifications and consents from time to time as requested by Company. If any other person is in any way involved in any Services, Consultant will obtain the foregoing ratifications, consents and authorizations from such person for Company's exclusive benefit.

f.   If any part of the Services or Inventions or information provided hereunder is based on, incorporates, or is an improvement or derivative of, or cannot be reasonably and fully made, used, reproduced, distributed and otherwise exploited without using or violating technology or intellectual property rights owned by or licensed to Consultant or any person involved in the Services and not assigned hereunder, Consultant hereby grants Company and its successors a perpetual, irrevocable, worldwide royalty-free, non-exclusive, transferable, sublicensable right and license to exploit and exercise all such technology and intellectual property rights in support of Company's exercise or exploitation of the Services, Inventions, Work Product, other work or information performed or provided hereunder, or any assigned rights, including any modifications, improvements and derivatives of any of them.

**3.   <u>Warranties and Other Obligations</u>.**
Consultant represents, warrants and covenants that: (a) the Services will be performed in a professional and workmanlike manner and that none of such Services nor any part of this Agreement is or will be inconsistent with any obligation Consultant may have to others; (b) all work under this Agreement shall be Consultant's original work and none of the Services, Work Product or Inventions nor any development, use, production, distribution or exploitation thereof will infringe, misappropriate or violate any intellectual property or other right of any person or entity; (c) Consultant has the full right to provide Company with the assignments and rights provided for herein and has written enforceable agreements with all persons necessary to give the rights to do the foregoing and otherwise fully perform this Agreement; (d) Consultant shall comply with all applicable laws and Company safety rules in the course of performing the Services; and (e) if Consultant's work requires a license, Consultant has obtained that license and the license is in full force and effect.

**4.   <u>Termination</u>.**
Both Company and Consultant may terminate the Agreement early as desired, upon providing 2 weeks advance written notice to the other party.  Such termination shall be effective after 2 weeks of notice of early termination. Upon an early termination, Consultant shall receive a pro-rated payment for services actually rendered, to the Company's reasonable satisfaction, up to the termination date. Sections 2 through 10 of this Agreement and any remedies for breach of this Agreement shall survive any termination or expiration. Company may communicate the surviving obligations contained in this Agreement to any other or potential client or employer of Consultant.

**5.   <u>Relationship of the Parties; Independent Contractor; No Employee Benefits</u>.**
Notwithstanding any provision hereof, Consultant is an independent contractor and is not an employee, agent, partner or joint venturer of Company and shall not bind nor attempt to bind Company to any obligation. Consultant shall accept any directions issued by Company pertaining to the goals to be attained and the results to be achieved by Consultant, but Consultant shall be solely responsible for the manner and hours in which the Services are performed under this Agreement. Consultant shall not be eligible to participate in any of Company's employee benefit plans, fringe benefit programs, group insurance arrangements or similar programs. Company shall not provide workers' compensation, disability insurance, Social Security or unemployment compensation coverage or any other statutory benefit to Consultant. Consultant shall comply at Consultant's

expense with all applicable provisions of workers' compensation laws, unemployment compensation laws, federal Social Security law, the Fair Labor Standards Act, federal, state and local income tax laws, and all other applicable federal, state and local laws, regulations and codes relating to terms and conditions of employment required to be fulfilled by employers or independent contractors. Consultant will ensure that its employees, contractors and others involved in the Services, if any, are bound in writing to the foregoing, and to all of Consultant's obligations under any provision of this Agreement, for Company's benefit and Consultant will be responsible for any noncompliance by them. Consultant agrees to indemnify Company from any and all claims, damages, liability, settlement, attorneys' fees and expenses, as incurred, on account of the foregoing or any breach of this Agreement or any other action or inaction by or for or on behalf of Consultant.

Consultant shall determine the manner, means and method of completing the Services (outlined in Exhibit A below), and Company reserves no control over the specific day-to-day Services rendered by Consultant. Consultant has the ability to set Consultant's own hours when Services will be performed. Further, Company enters into this Agreement with the expectation that Consultant has the requisite market understanding, training, and experience, and Company will not provide any education or training to Consultant on connection with the performance of Services.

**6.  Assignment.**
This Agreement and the Services are personal to Consultant and Consultant shall have no right or ability to assign, transfer or subcontract any rights or obligations under this Agreement. Any attempt to do so shall be void. Company may freely assign and transfer this Agreement in whole or part.

**7.  Notices.**
All notices under this Agreement shall be in writing and delivered in person, by overnight courier or confirmed email, in each case at the address set forth on the signature page or to such other address as such party last provided to the other by written notice. Notices will be deemed delivered upon receipt.

**8.  Indemnification.**
Consultant agrees to indemnify and hold harmless Company and its affiliates, and their respective directors, officers and employees from and against all taxes, losses, damages, liabilities, costs and expenses, including attorneys' fees and other legal expenses, arising directly or indirectly from or in connection with (a) any negligent, reckless, intentionally wrongful, or otherwise unlawful act of Consultant or Consultant's subcontractors, assistants, employees or agents, (b) a determination by a court or agency that Consultant is not an independent contractor, but only if Consultant initiated or joined in support of such court or agency action (c) any breach by Consultant or Consultant's assistants, employees or agents of any of the covenants contained in this Agreement, (d) any failure of Consultant, or Consultant's subcontractors, assistants, employees or agents,  to perform the Services in accordance with all applicable laws, rules and regulations, or (e) any violation of a third party's rights resulting in whole or in part from Company's use of the work product of Consultant under this Agreement. Consultant also agrees to provide workers' compensation insurance for Consultant's employees and agents and agrees to defend, hold harmless and indemnify Company for any and all claims arising out of any injury, disability, or death of any of Consultant's employees or agents.

**9.  Arbitration.**

Any controversy or claim (except those regarding Inventions, Work Product, Confidential Information or intellectual property) arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof, provided however, that each party will have a right to seek injunctive or other equitable relief in a court of law. The prevailing party will be entitled to receive from the non-prevailing party all costs, damages and expenses, including reasonable attorneys' fees, incurred by the prevailing party in connection with that action or proceeding, whether or not the controversy is reduced to judgment or award. The prevailing party will be that party who may be fairly said by the arbitrator(s) to have prevailed on the major disputed issues. Consultant hereby consents to the arbitration in the State of Texas in the County of Williamson.

NOTICE: This Agreement does not affect any immunity under 18 USC Sections 1833(b) (1) or (2), which read as follows (note that for purposes of this statute only, individuals performing work as contractors or consultants are considered to be employees):

(1) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

10. **Assignments; Use of Employees or Subcontractors**.
Consultant may not assign this Agreement or any duties or obligations under this Agreement without Company's express written consent. Any such assignment will be considered null and void. Company requires such consent to protect intellectual property rights and Client confidentialities. Consultant agrees to require any third-parties working on behalf of Consultant to sign intellectual property and confidentiality agreements prior to and as a condition of their employment or engagement. Company is authorized to assign any of its rights with or without the consent of Consultant.

11. **Miscellaneous.**
Any breach of Section 2 or 3 will cause irreparable harm to Company for which damages would not be an adequate remedy, and therefore, Company will be entitled to injunctive relief with respect thereto in addition to any other remedies. The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights. No changes, additions, modifications or waivers to this Agreement will be effective unless in writing and signed by both parties. In the event that any provision of this Agreement shall be determined to be illegal or unenforceable, that provision will be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without regard to the conflicts of laws provisions thereof. In any action or proceeding to enforce rights under this Agreement, the prevailing party will be entitled to recover costs and attorneys' fees. Headings herein are for convenience of reference only and shall in no way affect interpretation of the Agreement. This

5

Agreement and Exhibit A represent the entire understanding and agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements between the parties with respect to the subject matter hereof.

Consultant is responsible for payment of Consultant's taxes and insurance. Consultant is responsible for hiring any subcontractors, assistants, agents, or employees to assist Consultant to provide the Services described herein. All such subcontractors, assistants, agents, and employees shall be hired or engaged at Consultant's expense and all labor performed by any such person(s) shall be under the sole direction and control of Consultant. Consultant will determine the method, details, and means of performing the Services. Consultant may perform the services under this Agreement at any suitable time and location as Consultant chooses. Consultant will use their own resources such as supplies, equipment, tools, and materials to complete the Services. Consultant shall devote such working time and attention to the performance of the services as required to satisfy all duties and responsibilities of Consultant in finishing the assignment.

Consultant shall perform their obligations hereunder in compliance with the terms of this Agreement and any and all applicable laws and regulations. If necessity requires Consultant to perform any services on Company's property or requires Consultant to interact with any of Client's employees, customers, vendors, affiliates or members of the general public, Consultant shall comply with all of Company's policies and regulations to the greatest extent permitted by Texas law governing independent contractor agreements.

12. **Consultant Representations.** Consultant warrants that Consultant is legally capable of entering this Agreement and that there are no other existing agreements or instruments that would impair Consultant's ability to perform the services described in this Agreement. Consultant also warrants that any statements about Consultant's abilities or qualifications to competently complete the described services are accurate and made in good faith. Consultant warrants that all work completed will be Consultant's original work and will not in any way legally infringe upon the rights of others.

13. **Return of Materials**. Upon expiration or termination of this Agreement, successful completion of the services to be provided under this Agreement, or as otherwise requested by Company, Consultant will deliver to Company any Company documents, items, and materials and will provide Company with a signed, written certification that all such documents, items, and materials in the possession of Consultant (and any of Consultant's employees, agents, assistants and/or subcontractors) have been returned.

14. **Expiration of Agreement.** Unless otherwise terminated as provided in this Agreement, this Agreement will continue in effect until the Services provided for in this Agreement have been fully and completely performed to the satisfaction of Company or until such time as Company provides notice of termination.

15. **Entire Agreement; Modifications.** This Agreement, together with any exhibits, schedules, or other documents referenced herein, supersedes any and all agreements, either oral or written, between the parties with respect to the rendering of services by Consultant for Company and contains all of the representations, warranties, covenants, and agreements between the parties with respect to the rendering of those services. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made

by any party, or anyone acting on behalf of any party, which are not contained in this Agreement, and that no other agreement, statement, or promise not contained in this Agreement will be valid or binding. Any modification of this Agreement will be effective only if it is in a writing signed by an authorized representative of the party to be charged.

16. **Partial Invalidity; Severability; Modification.** If any provision, term, covenant or obligation of this Agreement, or its application, is held invalid, unenforceable, or unlawful, such invalidity, unenforceability or unlawfulness, shall not affect the other provisions, terms, covenants or obligations of this Agreement, or their application, which all shall remain valid and enforceable in full force and effect to the extent permitted by law. Further, if a court or other adjudicative body finds any covenant of this Agreement to be unenforceable with respect to a jurisdiction, the parties agree that the court shall amend such obligations for the protection of Company's business to the minimum extent necessary to render the provision enforceable and that the Agreement shall be enforced within such jurisdiction as so amended.

17. **Attorney's Fees.** If either party incurs any legal fees associated with the enforcement of this Agreement or any rights under this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees and any court, arbitration, mediation, or other litigation expenses from the other party.

**18. Good Faith and Fair Dealing.** This Agreement imposes a duty on Consultant to use Consultant's best and reasonable efforts to complete the Services described herein and to perform the duties, terms, and covenants of this Agreement.  Consultant specifically understands and agrees this Agreement imposes a duty of candor, loyalty, and good faith and fair dealing on Consultant.

**19. Waiver:** Rights Cumulative. No waiver of any term or right in this Agreement shall be effective unless in writing, signed by an authorized representative of the waiving party. The failure of either party to enforce any provision of this Agreement shall not be construed as a waiver or modification of such provision, or impairment of its right to enforce such provision or any other provision of this Agreement thereafter. The rights and remedies of the parties herein provided shall be cumulative and not exclusive of any rights or remedies provided by law or equity.

**20. Counterparts.** This Agreement may be executed by email and in one or more counterparts, each of which will be deemed to be an original, but all of which together will constitute one and the same instrument, without necessity of production of the others

7

## EXHIBIT A

This EXHIBIT A is attached to and incorporated into that certain Consulting Agreement, dated June 3, 2024, by and between Ashley Smith, Staccato 2011, LLC, and Staccato Ranch Texas, LLC, a Texas Limited Liability Company (the "Agreement"). Capitalized terms not otherwise defined shall have the meaning set forth in the Agreement. In the event of a conflict between the terms of this Exhibit and the Agreement, the terms of the Agreement will control.

### INSTRUCTOR

Dear Ashley,

We are pleased to offer you the position of Instructor. In this position you will report to the VP Training for Staccato Ranch. As an officer and a social media influencer, we believe you have strong alignment with our mission and values, and you have the experience to make an immediate impact for the Staccato brand and Staccato Ranch members and guests. While we have discussed the position, we have highlighted specifics related to our company and mission, as well as responsibilities and goals of your role.

**THE COMPANY**
Built for Heroes and based in Florence, Texas, Staccato is on a mission to proudly serve those who protect and embody American freedoms. As the inventors of the 2011® platform—the World's Best Shooting Pistols—Staccato manufactures its handguns and ammunition in America at their headquarters in Florence, TX. The Staccato 2011 has been approved for on- or off-duty carry by over 1,600 U.S. law enforcement agencies in just five years, including elite teams such as U.S. Marshals Special Operations Group, the Texas Rangers and Miami Dade Special Response Team. With a spirit of American ingenuity and commitment to its family of owners, Staccato guarantees its guns for life, and guarantees supply of its 9mm ammunition to subscribers of its ammo service. Staccato Ranch serves as the place where Staccato unites its family of patriots to celebrate freedom and elevate heroes every day.

Staccato was ranked one of the Fastest Growing Private Companies in the Southwest by Inc. Over 25% of our team members are veterans and 100% are patriots. We strive relentlessly to achieve our best every day and are focused on continuous improvement and progress in everything we do.

**THE MISSION**
We protect freedom. We proudly serve those who protect and embody American freedoms.

**RESPONSIBILITIES: INSTRUCTOR**
You will serve as a world-class pistol Instructor for Staccato Ranch. Building on the trust and credibility Staccato has earned with its growing and loyal customer base, you will support our Staccato family members with the best pistol training, using Staccato Ranch's training curriculum as the curriculum gets more defined. As a Staccato team member, you will display entrepreneurialism and energy, reflect our core values, and share the shootability of our pistols, the insane accuracy of our ammunition, and the uniqueness of our Staccato Ranch experiences both through your instruction and your personal social media.

8

**Key responsibilities include**:

1) **World-Class Training:** Assist in providing world-class pistol training to members and guests of the Staccato Ranch, so our family of Staccato owners build courage, confidence, and proficiency. Minimum 48 days of training for Staccato Ranch annually or an average of four per month

2) **Women's Training:** Assist in instruction of women's classes using Staccato Ranch's training curriculum for women (which count towards the 48 days of training at Staccato Ranch

3) **Membership Conversion:** Convert students and guests who are not members into members

4) **Ammo Subscription Conversion:** Convert students and guests who are not Staccato Ammo subscribers into subscribers

5) **Virtual/Video Training:** Collaborate with the Marketing and Staccato Ranch teams to plan and create training videos that can be used both for publication broadly (e.g. social media, website, email), as well as privately only to Staccato Ranch and 368 members as a value add to their membership. Minimum of 2 training videos per month

**COMPENSATION**

Your contract compensation will be $5,000 per month covering the responsibilities listed above. Any additional days worked for Staccato Ranch Training must be approved in advance and will be paid as follows:

- $500 per additional day of instruction
- $250 per additional day of travel

**Signatures**
**Contractor:**

Signature: _Ashley Smith (Jun 6, 2024 09:16 EDT)_

Name:    Ashley Smith

Date:    Jun 6, 2024

**Company Representative:**

Signature: _Mike Benbow (Jun 6, 2024 09:16 CDT)_

Name:    Mike Benbow

Date:    Jun 6, 2024

# 20240603_Ashley Smith_Contract Offer_Instructor

Final Audit Report                                                    2024-06-06

| | |
|---|---|
| Created: | 2024-06-03 |
| By: | David Fossas (david.fossas@staccato2011.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAASISx3xpHlNKZ5lu0ZHqGMuc0RyvFxtnc |

## "20240603_Ashley Smith_Contract Offer_Instructor" History

📄 Document created by David Fossas (david.fossas@staccato2011.com)
   2024-06-03 - 11:40:38 AM GMT

📧 Document emailed to officerashleysmith@yahoo.com for signature
   2024-06-03 - 11:41:46 AM GMT

📄 Email viewed by officerashleysmith@yahoo.com
   2024-06-03 - 8:09:56 PM GMT

✒ Signer officerashleysmith@yahoo.com entered name at signing as Ashley Smith
   2024-06-06 - 1:16:05 PM GMT

✒ Document e-signed by Ashley Smith (officerashleysmith@yahoo.com)
   Signature Date: 2024-06-06 - 1:16:07 PM GMT - Time Source: server

📧 Document emailed to mike.benbow@staccato2011.com for signature
   2024-06-06 - 1:16:08 PM GMT

📄 Email viewed by mike.benbow@staccato2011.com
   2024-06-06 - 2:15:31 PM GMT

✒ Signer mike.benbow@staccato2011.com entered name at signing as Mike Benbow
   2024-06-06 - 2:16:32 PM GMT

✒ Document e-signed by Mike Benbow (mike.benbow@staccato2011.com)
   Signature Date: 2024-06-06 - 2:16:34 PM GMT - Time Source: server

✅ Agreement completed.
   2024-06-06 - 2:16:34 PM GMT

 Adobe Acrobat Sign

# EXHIBIT C



Sergeant Ashley Smith
ashley.smith@staccatoranch.com

Dear Ashley,

Nevada PF, LLC ("PrairieFire Nevada," "PFNV," or the "Company") is delighted to extend you an offer of employment (the "Offer") at PrairieFire Nevada. The position responsibilities and relevant details of our Offer are outlined below.

| | |
|---|---|
| **Title:** | **Vice President of Experience and Staccato Representative** |
| **Key Responsibilities:** | As the VP of Experience, you will be responsible for working together with the Chief Revenue Officer and others to develop and deliver unique guest experiences that can't be found anywhere in the world.  These immersive shooting and special forces inspired experiences will tap into the imagination of our guests, leaving them with lifelong memories they can't wait to share with their friends and family. |

Your responsibilities will include, but not be limited to, the following:

1) **Vegas Experience Development:** Help develop, pilot, and launch repeatable half-day immersive experiences that pickup and drop off on the Vegas strip with goal of becoming a "can't miss" experience for any Vegas visitor interested in experiencing American freedom and the thrill of dynamic and unique shooting experiences.  You will be expected to personally lead guest experiences twice a month, interacting directly with guests and driving membership conversion.
2) **Content Capture and Social:** Oversee and manage a plan that results in every guest to Prairie Fire leaving with photo and video content (e.g., 5 key photo moments and an experience video) that they can't wait to share with their family, friends, and on social media.
3) **Social Media Strategy:** Execute a social media strategy that leverages the user generated content above, reposting and highlighting authentic content generated by our guests. Ensure our guests are feeling recognized and appreciated when they post about their Prairie Fire experiences and make it easy for them to do so.
4) **Video Content:** In addition to user generated content above, oversee the development of a handful of imagination inspiring, exciting and emotionally engaging videos that can be used to advertise and broadly promote the Prairie Fire experience.
5) **Membership Conversion:** Convert guests to members at key opportunities throughout their Prairie Fire journey.

| | |
|---|---|
| **Staccato Representative Responsibilities** | As the Staccato Representative at Prairie Fire, you are responsible for being the Staccato expert onsite at Prairie Fire with knowledge and experience with all Staccato products.  Your goal is to ensure that Staccatos are the pistol of choice for every guest who is looking for the best performing pistol and who expects a premium and well-known brand.  You will help ensure the Pro Shop is carrying the right inventory of products and that staff are trained on how to best represent and sell |



Staccatos to guests and members.  You will utilize Staccato pistols when providing guest experiences at Prairie Fire.

**Staccato Ranch Responsibilities**

- You will complete your two upcoming scheduled classes at Staccato Ranch
- You will continue to promote Staccato, Staccato Ranch, and Staccato Ammo and Merchandise in podcasts, your own social media posts and photo/video content to positively spread the word about Staccato and to support the brand's success.  You will provide video/photo content as requested to support any of the Staccato business lines.

**Hybrid Work, Weekend and Onsite Time Expectations**

It is expected that while many of your responsibilities and work can be performed remotely, your regular onsite presence at Prairie Fire will be crucial for the success of this role.  As such, you are expected to be onsite at Prairie Fire an average of 4 days per month.  Most of your Prairie Fire visits should include the highest guest traffic days which may include weekends and holidays. Your reasonable, direct out of pocket travel and lodging costs related to Prairie Fire and Staccato business lines will be reimbursed.

**Compensation:**

- Base Salary — $110,000 annually

- Membership Acquisition Incentive — $10/member/month beginning the second month of any membership and continuing for as long as the member is retained, and you continue to work for Prairie Fire

- Social Media Incentive — $5,000 for every 5,000 in net follower growth on Instagram

- Guest Content Social Sharing — $25 per guest posting Prairie Fire content to their socials

- Staccato Pistols — One of each model of Staccato pistols to be used to actively train, promote and market Staccato pistols.

- Staccato Ammo — One case each of Staccato Match and Staccato range monthly for use in training, classes, competitions and to market and promote Staccato Ammo

**Reporting:**  You will report directly to the SVP of Revenue and Hospitality.

**Benefits:**  As a designated Full-time employee, you will be eligible to participate in the Company's Health, Dental, and available ancillary benefits plans. You will also be eligible for time-off benefits as outlined under the PrairieFire Nevada PTO Policy.

**Start Date:**  Your first date of full-time employment will be no later than August 20th, 2024.



**At-Will Employment:**     You acknowledge and understand that your employment and compensation are at-will and therefore can be terminated, with or without cause, at any time without prior notice, at your option or the Company's option.

The Company also reserves the right to modify the terms, benefits, and conditions of your employment at any time. This at-will employment relationship may not be modified by any oral or implied agreement, and no employee handbook, course of conduct, practice, policy, award, promotion, performance evaluation, transfer or length of service can modify this at-will relationship.

**Policies and Procedures:**     As an employee of PrairieFire Nevada, you will be subject to all rules, policies and procedures which are or may become applicable to the Company's employees generally, including without limitation, the Company's Compliance Manual and the Company's Employee Handbook.

Ashley, we look forward to working with you and building an extraordinary company. You will be instrumental in achieving our mission for our members and guests.

Very Respectfully,

Levi Rogers
SVP Revenue and Hospitality
PrairieFire Nevada

Signed by:
*Levi Rogers*
35E923049B5F480...     7/16/2024

Agreed and Accepted By:

Signed by:
[signature]
23E6D6DFFAD34A5...

Ashley Smith

7/16/2024
Date